**NORTHERN AREA PERSONAL CARE HOME ADMINISTRATORS ASSOCIATION; Southeastern Regional Caregivers Alliance; Hopwood Village Manor; Sandra Pantalo; Linda's Nursing Service, Inc., t/d/b/a Colonial Gardens Guest House; Idelle Corporation t/d/b/a Carmella's House; Paxton Street Benevolent Society, Inc., t/d/b/a Paxton Street Home, Petitioners**

v.

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 6, 2006.

Decided May 24, 2006.

Robert B. Hoffman, Harrisburg, for petitioner, Northern Area Personal Care Home Administrators Association.

Michael A. Hynum, New Cumberland, for petitioner, Southeastern Regional Caregivers Alliance.

Howard C. Ulan, Sr. Asst. Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Before this Court are preliminary objections in the nature of a demurrer filed by the Commonwealth of Pennsylvania, Department of Public Welfare (DPW) in response to an amended petition for review filed in our original jurisdiction by Northern Area Personal Care Home Administrators Association, *et al* (collectively, the Association)[1] challenging the validity of the new Personal Care Home regulations found at 55 Pa.Code §§ 2600.1–2600.270.

On November 30, 2005, the Association filed an amended petition for review[2] in this Court's original jurisdiction challenging DPW's actions in promulgating new regulations codified at 55 Pa.Code §§ 2600.1–2600.270, which govern personal

---

1. The other petitioners are the Southeastern Regional Caregivers Alliance (also an association); four personal care homes—Hopwood Village Manor; Linda's Nursing Service, Inc., t/d/b/a Colonial Gardens Guest House; Idelle Corporation, t/d/b/a Carmella's House; and the Paxton Street Benevolent Society, Inc., t/d/b/a Paxton Street Home; and Hopwood's licensed administrator, Sandra Pantalo.

2. The Association originally filed a petition on October 5, 2005. A hearing on the petition for a preliminary injunction was held on October 27, 2005, and by order dated November 10, 2005, this Court preliminarily enjoined certain selected regulations. Those sections, all at 55 Pa.Code, included: Section 2600.4 (definition of personal care home and personal care services); Section 2600.16 (reportable incidents); Section 2600.53 (administrator qualifications); Section 2600.54(a) (direct staff qualifications); Sections 2600.23, 2600.56 and 2600.60 (heightened staffing requirements); Section 2600.65(d–3) (required annual training and pre-employment training); Section 2600.64(c) (administrator training); Section 2600.89(c) (water); Section 2600.101 (resident bedrooms); Section 2600.122 (exits); and Section 2600.187 (medication records). DPW appealed to our Supreme Court, and the preliminary injunction was stayed automatically. The Association filed a motion with this Court seeking to lift the stay which we granted by order dated March 28, 2006.

care homes that were scheduled to take effect on October 24, 2005.[3] In general terms, the petition alleges that the new regulations will 1) impose many new requirements compared to the current regulations; 2) dramatically change the nature of personal care homes and who resides in them; and 3) impose significant additional costs on personal care homes which they would not be able to recoup. In more specific terms, the petition alleges that the new regulations:

- require that an administrator must now demonstrate competence in multiple areas beyond those established by the Legislature in the old regulations;
- redefine what constitutes "personal care homes," "personal care services," "activities of daily living," and "instrumental activities of daily living;" and
- impose greater costs in many areas by imposing new rules as to who can administer medications, and making it more difficult to recoup additional costs for subsidized residents.

In Count I of its amended petition, the Association alleges that the new personal care home regulations are invalid because they are contrary to the criteria established in the Public Welfare Code.[4] They state that the new regulations redefine the persons who are appropriate for care in a personal care home to include persons with substantially greater medical problems, disabilities and other needs not contemplated by Act 185 and then seek to require personal care homes to provide those services. Additionally, other new regulations, such as increases in the qualifications of administrators and staff, assessments, etc., all stem from the need to staff personal care homes to meet the expanded and increased needs.

In Count II of its petition, the Association alleges that its due process rights are violated by the new regulations because they impose substantial new costs upon the personal care homes, and the regulations prohibit or make it impracticable for personal care homes to recover any additional costs from residents.[5] In Count III, it alleges that DPW has violated the State Plan provisions of Act 185 because it has not updated the State Plan; it has not done a cost analysis of the State Plan and of all regulations that will be proposed; and it has not provided notice of the proposed changes to the entire General Assembly. The Association requests this Court to declare that the new regulations

3. The Association also explains that certain regulations at 55 Pa.Code will take effect after that date: Section 2600.65(d) will take effect on April 24, 2006; Section 2600.19(g) will take effect on October 24, 2006; and Sections 2600.122, 2600.130(e) and 2600.182 will take effect on April 24, 2007.

4. Act of June 13, 1967, P.L. 31, *as amended by the* Act of December 21, 1988, P.L. 1883, No. 185, 62 P.S. §§ 101–1503. The Association refers to the Public Welfare Code as "Act 185."

5. The Association relies on the Fifth and Fourteenth Amendments to the United States Constitution and *Duquesne Light Company v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989), where the United States

Supreme Court stated that "[t]he guiding principal has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory ... If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation." This Court has applied this analysis to rates charged by automobile insurance providers, who are not public utilities and have the ability to decline to write insurance in the Commonwealth. *See Prudential Property & Casualty Ins. Co. v. Department of Ins.*, 141 Pa.Cmwlth. 156, 595 A.2d 649 (1991). "When the Commonwealth both sets the rates and regulates the entity, the *Barasch* principles apply." (Association's brief in opposition to preliminary objections at 23.)

are invalid and to enjoin DPW from applying them.

██ In response, DPW has filed preliminary objections in the nature of a demurrer alleging the following regarding the three counts:

- Count I—Nothing in 55 Pa.Code, Chapter 2600 conflicts with Act 185 or with Sections 211, 213 and 1021 of the Public Welfare Code, 62 P.S. §§ 211, 213 and 1021;
- Count II—No facts averred by the Association, even if true, warrant relief on substantive due process grounds;
- Count III—The Act cited by the Association for the State Plan requirement is incorrect; it is Act 105, not Act 185. Even correcting that mistake, Act 105 does not require DPW to revise the State Plan.

DPW also avers that the Association has failed to exhaust its administrative remedies because waivers may be sought for all regulations challenged, and for any enforcement action under 55 Pa.Code Chapter 2600, an administrative appeal is available under 1 Pa.Code, Part II (relating to general rules of administrative practice and procedure). Before addressing DPW's preliminary objections[6] to the specific counts, we will address its contention that the Association failed to exhaust its administrative remedies because if the Association has failed to do so, we need not address the other arguments.

### Administrative Remedies

██ DPW argues that the Association failed to exhaust its administrative remedies because pursuant to 55 Pa.Code § 2600.19, the Association may file a waiver to any regulation. That section provides in relevant part:

(a) A home may submit a written request for a waiver of a specific requirement contained in this chapter. The waiver request must be on a form prescribed by the Department. The Secretary, or the Secretary's appointee, may grant a waiver of a specific requirement of this chapter if the following conditions are met:

(1) There is no jeopardy to the residents.

(2) There is an alternative for providing an equivalent level of health, safety and well-being protection of the residents.

(3) Residents will benefit from the waiver of the requirement.

(b) The scope, definitions, applicability or residents' rights under this chapter may not be waived.

(c) At least 30 days prior to the submission of the completed written waiver request to the Department, the home shall provide a copy of the completed written waiver request *to the affected resident* and designated person to provide the opportunity to submit comments to the Department. The home shall provide the affected resident and designated person with the name, address and telephone number of the Department staff person to submit comments. (Emphasis added.)

DPW then points out that in the event it provides an adverse ruling on the waiver request, the affected party can file an administrative appeal.

The Association, however, argues that such steps are neither necessary nor practical in this type of situation where it is alleging that many of DPW's regulations are problematic for a variety of reasons.

---

**6.** Preliminary objections should be sustained only in cases where it is clear and free from doubt that the facts pled are legally insufficient to establish a right to relief. *Werner v. Zazyczny,* 545 Pa. 570, 681 A.2d 1331 (1996).

It relies on *Arsenal Coal Company v. Department of Environmental Resources (DER)*, 505 Pa. 198, 477 A.2d 1333 (1984), where, in a similar type of situation, DER adopted regulations promulgated by the Environmental Quality Board (Board), and the Arsenal Coal Company (Arsenal) and other mine operators filed in our original jurisdiction a petition to enjoin DER from implementing or enforcing those regulations. Arsenal alleged that the regulations exceeded the Board's rulemaking power under the Surface Mining Conservation and Reclamation Act, Act of 1977, P.L. 95–87, Title I, § 101, 91 Stat. 447, 30 U.S.C. §§ 1201 *et seq.* We denied Arsenal's petition, concluding that it failed to exhaust its administrative remedies, but on appeal, our Supreme Court determined otherwise stating:

> [T]he propriety of invoking the original equitable jurisdiction of the Commonwealth Court in a case seeking pre-enforcement review of a substantial challenge to the validity of regulations promulgated by an administrative agency is clear. A court of equity, however, must refrain from exercising its jurisdiction when there exists an adequate statutory remedy.

*Id.* at 208, 477 A.2d at 1338. The Court went on to explain that the remedy provided by statute was inadequate because it provided the Board with the power to hold a hearing and issue an adjudication only after a order, permit, license or decision of DER has been issued or rendered. "Pre-enforcement review, however, is clearly not within the authority of the Environmental Hearing Board and any suggestion to the contrary can only be founded upon a strained and unrealistic construction of the language of the Code." *Id.* at 208–209, 477 A.2d at 1339. The Court then provided guidelines as to when a challenged regulation could be entertained without first exhausting other administrative remedies:

> Where the effect of the challenged regulations upon the industry regulated is direct and immediate, the hardship thus presented suffices to establish the justiciability of the challenge in advance of enforcement. [Citations omitted.] We believe that the asserted impact of the regulations in the instant case is sufficiently direct and immediate to render the issue appropriate for judicial review, the lengthy process by which the validity of the regulations will be addressed on a basis of application to the litigant would result in ongoing uncertainty in the day to day business operations of an industry which the General Assembly clearly intended to protect from unnecessary upheaval.

* * *

The alternative to challenging the regulation through non-compliance is to submit to the regulations. We cannot say that the burden of such a course is other than substantial, accepting, as we must on a motion to dismiss on the pleadings, the allegations of the complaint as true. Appellants have alleged that the regulations require the expenditure of substantial sums to comply which, while not immediately calculable, will substantially impair the cash flow of all Appellants. Whether or not this allegation is true, it is clear that if Appellants elect to comply and await judicial determination of validity in subsequent piecemeal litigation, the process would be costly and inefficient.

The Department urges that the threat of enforcement proceedings for non-compliance with a judicially untested regulation is unrealistic for the power of the Department to be flexible in applying the regulations and its power to waive certain requirements lessens the likelihood of enforcement. We, of course, cannot accept this argument as mere representation by the Department that

it will ultimately be flexible and exercise its waiver power cannot defeat Appellants' assertion of immediate hardship. *Id.* at 210–211, 477 A.2d at 1339, 1340. Just as in *Arsenal,* the Association, in this case, also alleges that it will be required to expend large sums of money based on the newly promulgated regulations. Because the Code in this case does not provide any pre-enforcement review, utilizing the same reasoning applied in *Arsenal,* we agree that the Association does not have to exhaust administrative remedies. Consequently, we will address the remaining preliminary objections.

### Count I

▆ In Count I of its petition, the Association argues that DPW has promulgated two regulations that conflict with the enabling statute. Because where there is a conflict between a statute and a regulation promulgated thereunder, the statute must prevail, *Commonwealth v. Reynolds,* 876 A.2d 1088 (Pa.Cmwlth.2005), it argues that both of those regulations are illegal and cannot be enforced.

### A.

▆ The first regulation that the Association challenges is 55 Pa.Code § 2600.4 which, it contends, impermissibly broadens the definition of what constitutes a personal care home as set forth in Section 1001 of the Public Welfare Code, 62 P.S. § 1001, which defines "personal care home" as:

> any premises in which food, shelter and personal assistance or supervision are provided for a period exceeding twenty-four hours for four or more adults who are not relatives of the operator, who do not require the services in or of a li-

censed long-term care facility but who do require assistance or supervision in *such matters as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self administration.* (Emphasis added.)

The Association notes that while the old regulation used the same statutory definition, the new regulation at 55 Pa.Code § 2600.4 now defines "personal care home" as:

> (i) A premise in which food, shelter and personal assistance or supervision are provided for a period exceeding 24 hours, for four or more adults who are not relatives of the operator, who do not require the services in or of a licensed long-term care facility, but who do require assistance or supervision in *activities of daily living or instrumental activities of daily living.* (Emphasis added.)

55 Pa.Code § 2600.4. "Activities of daily living" is defined under the regulation to "include eating, drinking, ambulating, transferring in and out of a bed or chair, toileting, bladder and bowel management, personal hygiene, securing health care, managing health care, self-administering medication, and proper turning and positioning in a bed or chair" and "instrumental activities of daily living" as "doing laundry; shopping; securing and using transportation; managing finances; using a telephone; making and keeping appointments; caring for personal possessions; writing correspondence; engaging in social and leisure activities; using a prosthetic device; and obtaining and keeping clean, seasonal clothing." *Id.*[7] Together

---

7. The definition of "personal care services" has also changed under the new regulations at 55 Pa.Code § 2600.4. Under the former regulations at 55 Pa.Code § 2620.3, that definition precisely tracked the statutory definition and defined "personal care services" as

"assistance or supervision in such matters as dressing, bathing, diet, financial management, evacuation of a residence in the event of an emergency or medication prescribed for self administration." However, under the new regulations, the definition of "personal care

with the corresponding change to the definition of "personal care services" which tracks the new and expanded non-statutory definition of "personal care home;" "activities of daily living; and "instrumental activities of daily living," *Id.*, the Association contends the new regulation impermissibly expands both of those definitions as well and is significant because DPW surveyors will measure a home's compliance with regulations by determining whether they have provided residents with the full range of services covered by these expanded definitions.

DPW contends that Count I of the petition fails because nothing in 55 Pa.Code, Chapter 2600 conflicts with Act 185 or with the provisions of the Public Welfare Code found at Sections 211, 213 and 1021, 62 P.S. §§ 211, 213 and 1021. It argues that the Public Welfare Code grants it broad authority to license and regulate personal care homes, and this regulation is well within delegated powers. *See* Sections 1001 and 1021 of the Public Welfare Code, 62 P.S. §§ 1001, 1021 (authorizing DPW to adopt regulations establishing minimum standards for building, equipment, operation, care, program and services). Because the challenged regulation is within DPW's delegated powers and the area is not in conflict but supplements the enabling statute and is rationally related to the statutory purpose, it contends that 55 Pa.Code § 2600.4 is valid and the Association's challenge to this regulation must be dismissed.

Section 1001 of the Public Welfare Code, 62 P.S. § 1001, sets forth the type of services that a nursing home must provide, stating that it must provide "assistance or supervision in such matters as dressing, bathing, diet, etc." Although the Associa-

tion contends that those activities listed in the statute are the only ones that a personal care home can provide, and that the regulations impermissibly expand the permitted activities that a nursing home can undertake, the statute does not limit what services a personal care home can provide. Rather, it lists examples of the type of activities that require "assistance or supervision." While the new regulation definitions of the terms *"activities of daily living"* and *"instrumental activities of daily living"* are more expansive than the ones contained in 62 P.S. § 1001, the activities listed in this provision were examples of the type of activities that require personal assistance or supervision and were not a list of the only types of services that could be offered. Because the services in the definition of "personal care home" and "personal care services" are the type of activities that require "assistance or supervision," 55 Pa.Code § 2600.4 is not in conflict with 62 P.S. § 1001. *McClellan v. Health Maintenance Organization of Pennsylvania*, 546 Pa. 463, 686 A.2d 801 (1996). Accordingly, DPW's preliminary objection to that portion of Count I is sustained.

**B.**

The second regulation that the Association challenges is 55 Pa.Code § 2600.53 which it contends imposes additional qualifications that personal home administrators must meet such as being a licensed registered nurse **or** having an associate's degree **or** 60 credit hours from an accredited college or university **or** being a licensed practical nurse with one year of work experience in a related field. The Association contends that because Section 213 of the Public Welfare Code,[8] 62 P.S.

services" tracks the new and expanded non-statutory definition of "personal care home;" "activities of daily living;" and "instrumental activities of daily living."

**8.** *Added by* the Act of July 10, 1980.

§ 213, only requires a demonstration of competency in specified areas and imposes no credential requirement, DPW has clearly imposed something that the legislature did not.[9]  62 P.S. § 213 provides:

(a) After December 31, 1990, all personal care homes shall identify and appoint a personal care home administrator or administrators who meet the qualifications provided in this section.

(b) A personal care home administrator shall:

(1) be at least twenty-one years of age and be of good moral character; and

(2) have knowledge, education and training in all of the following:

(i) fire prevention and emergency planning;

(ii) first aid, medications, medical terminology and personal hygiene;

(iii) local, State and Federal laws and regulations;

(iv) nutrition, food handling and sanitation;

(v) recreation;

(vi) mental illness and gerontology;

(vii) community resources and social services; and

(viii) staff supervision, budgeting, financial record keeping and training; or

(3) be a licensed nursing home administrator. The department may establish separate standards of knowledge and training for licensed nursing home administrators who wish to operate a personal care home.

(c) The department may promulgate regulations requiring orientation and training for all direct care staff in a personal care home.

*(d) By June 1, 1989, the department shall by regulation develop such standards for knowledge, education or training to meet the standards of this section.* (Emphasis added.)

Because 62 P.S. § 213(d) specifically gives DPW the power to promulgate regulations to provide the *"standards for knowledge, education or training"* to meet its standards set forth, we cannot see how 55 Pa.Code § 2600.53 is in any way at variance with the statute just because it requires credentialing to establish the person seeking a position as a personal care administrator in a personal care nursing home has met the "standards for knowledge, education or training" necessary to be qualified as a personal care administrator.  Consequently, DPW's preliminary objection to this portion of Count I is sustained as well.

### Count II

██  In Count II of its petition, the Association contends that its due process rights under the Fifth and Fourteenth Amendments to the United States Constitution[10] will be violated because of the increased costs associated with the new regulations (i.e., more duties and more staff equals more costs), and it will not be able to recoup those costs or receive sufficient reimbursement from Medicare to

---

**9.** The Association argues that this point is important because Sandra Pantalo qualified as an administrator under the old regulations but did not under the new ones solely because of the new requirements.

**10.** The Fifth Amendment to the United States Constitution provides, in relevant part:

No person shall be ... deprived of life, liberty, or property, without due process of

law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V. The Fourteenth Amendment to the United States Constitution provides, in relevant part:

[N]or shall any state deprive any person of life, liberty, or property, without due process of law ...

U.S. Const. amend. XIV.

cover the costs. Essentially, the Association, without saying so, equates the non-reimbursement of costs with a taking of property without just compensation—a regulatory taking.

█ In this case, the fact that the new regulations may impact providers' profitability or their ability to stay in business or may impact upon any contractual obligation to provide services at the Medicare reimbursement rate does not transform the challenged regulations into a regulatory taking. *See Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Where a property owner is legally compelled to engage in a price-regulated activity, for example, a public utility, the imposition of regulations may give rise to a taking, but when a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and, thus, there can be no taking. *See Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Garelick v. Sullivan,* 987 F.2d 913 (2nd. Cir.1993). Because the Association voluntarily participates in the Medicare Program and is under no compulsion to provide services to Medicare residents, there can be no regulatory taking.

Not only can there not be a regulatory taking claim because the Association voluntarily participates in the Medicare program, but a regulatory taking cannot be maintained because DPW's regulations are promulgated as to what standards need to be met to insure the welfare of personal care residents, not based upon what the

federal government decides to reimburse for those services. Otherwise, the setting of the reimbursement rate by the federal government to voluntary participants in its programs would have the effect of setting the level of regulations. Having said that, we hope that DPW is ultimately correct in its assessment that costs will actually go down with the imposition of the new regulations [11] because, if not, persons who have no other resources with which to pay for personal care homes will not be able to receive the needed care. Because a claim that a regulation causes increased costs that will not be reimbursed is not a violation of due process rights or a regulatory taking, DPW's preliminary objection to Count II is sustained.

### Count III

█ The Association has also alleged that DPW revised the State Plan without complying with the requirements in Section 211 of the Public Welfare Code, 62 P.S. § 211.[12] Specifically, it argues that although DPW is not required to amend the State Plan or to issue new regulations, it cannot issue new regulations without complying with the State Plan requirements of including a cost analysis and providing notice of the proposed changes to the entire General Assembly which it has not done. DPW argues that Count III is baseless because all that 62 P.S. § 211 requires is a one-time State Plan without any further revision, and DPW published a State Plan in 1981.

Section 211(a) of the Public Welfare Code, 62 P.S. § 211(a), provides:

---

11. DPW argues that there is no due process violation because the Association's claim that the new regulations impose higher costs is false. In fact, DPW states that the new regulations are less costly in many instances. For example, DPW states that under the old regulation at 55 Pa.Code § 2620, non-professional staff could not administer medication. However, under the new regulation at 55 Pa.Code

§ 2600.181–182, trained non-professional staff are allowed to administer medication, greatly reducing the need for licensed professionals, such as registered nurses, to administer medications.

12. We note this section was added on July 10, 1980, by P.L. 493, No. 105 and subsequently amended by Act 185.

In accordance with the statutory authority and responsibility vested in the department to regulate nonprofit homes for adults which provide personal care and services and to license for profit personal care homes for adults, pursuant to Articles IX and X, the department shall develop and implement a State Plan for regulating and licensing said facilities as defined by section 1001 of this act.

Section 211(c) of the Public Welfare Code, 62 P.S. § 211(c), provides:

Within three months following the effective date of this act, the department shall submit to the General Assembly for comment and review, and publish in the Pennsylvania Bulletin in accordance with the provisions of the Commonwealth Documents Law relating to the publication of regulations, a preliminary State Plan for regulating and licensing personal care homes.

Section 211(d) of the Public Welfare Code, 62 P.S. § 211(d), provides what information should be included in the State Plan. Section 211(f) of the Public Welfare Code, 62 P.S. § 211(f), provides that within six months of the effective date of the Act, DPW shall adopt a final State Plan which shall be submitted and published in the same manner as the preliminary plan. Relevant to the issue at hand is subsection (h), which provides:

At no time may the department change, alter, amend or modify the final State Plan, except in emergency situations, without first publishing such change in the Pennsylvania Bulletin in accordance with the Commonwealth Documents Law relating to publication of regulations and without first submitting the proposed change to the General Assembly for comment and review. In an emergency, the department may change, alter, amend or modify the State Plan without publishing the change or submitting the change to the General Assembly; but, within thirty days, the department shall submit and publish the change as otherwise required. (Emphasis added.)

There is no allegation here that DPW has created a new State Plan, but only that it has made amendments to the regulations. Nowhere in the statute does it state that every time amendments are made to regulations that DPW must comply with State Plan requirements. Because no such requirement exists, the Association's argument is without merit.

Accordingly, the preliminary objections filed by the Department are sustained as to all Counts and the Association's petition for review is dismissed.

## ORDER

AND NOW, this *24th* day of *May*, 2006, the preliminary objections filed by the Respondent are sustained and Petitioner's petition for review is dismissed.

CONCURRING and DISSENTING OPINION BY Judge COHN JUBELIRER.

I agree with the majority's disposition of all issues except the issue raised in Count I, as to whether there is a material conflict between the regulations promulgated by the Department of Public Welfare regarding personal care homes, and the provisions of the authorizing statute.[1]

---

1. The standard for ruling on preliminary objections is well established:

In ruling on preliminary objections, the Court must accept as true all well pleaded allegations of material fact as well as all of the inferences reasonably deducible from the facts pleaded. For preliminary objections to be sustained, it must appear with certainty that the law will permit no recovery, and any doubt must be resolved in favor of the non-moving party by refusing to sustain the objections. When the motion

I agree with the characterization made by Northern Area Personal Care Home Administrators Association, *et al* (collectively, the Association), that the regulations seem to impose on personal care homes "tasks of an entirely different nature and character" than those mentioned in the statutory language, and that these regulatory categories "reflect residents with ... greater disabilities and higher acuity levels." (Association's Br. at 22.)[2]

Whether or not the Association, in the end, ultimately prevails on this issue, I would find the Association has established a sufficient material conflict between the regulations and authorizing statute to withstand a demurrer as to this Count. Accordingly, I dissent from the majority's sustaining the demurrer as to Count I and concur with the majority in all other respects.

is in the nature of a demurrer, all of the non-moving party's allegations of fact in the complaint must be accepted as true, and only those facts specifically admitted may be considered against the non-moving party.
*Smith v. Pa. Employees Benefit Trust Fund,* 894 A.2d 874, 881 (Pa.Cmwlth.2006) (citations omitted).

2. *See generally McClellan v. Health Maint. Org. of Pa.,* 546 Pa. 463, 472, 686 A.2d 801, 805 (1996) ("It is widely accepted that general expressions such as 'including, but not limited to' that precede a specific list of included items should not be construed in their widest context, but apply only to persons or things of the same general kind or class as those specifically mentioned in the list of examples.")

In the following quotations from the applicable regulations, I have highlighted, by boldface, those tasks in the regulations that I agree with the Association could exceed the kind and class of those in the statute. The regulation defines "activities of daily living" as:

> The term includes eating, drinking, **ambulating, transferring in and out of a bed or chair, toileting, bladder and bowel management,** personal hygiene, **securing health care, managing health care,** self-administering medication and **proper turning and positioning in a bed or chair.**

55 Pa.Code § 2600.4 (emphasis added). "Instrumental activities of daily living" is defined as:

> The term includes the following activities when done on behalf of a resident: (i) **Doing laundry.** (ii) **Shopping.** (iii) **Securing and using transportation.** (iv) **Managing finances.** (v) **Using a telephone.** (vi) **Making and keeping appointments.** (vii) **Caring for personal possessions.** (viii) **Writing correspondence.** (ix) **Engaging in social and leisure activities.** (x) **Using a prosthetic device.** (xi) **Obtaining and keeping clean, seasonal clothing.**

55 Pa.Code § 2600.4 (emphasis added).